Argued and submitted January 15, 2019, affirmed June 3, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*
*v.*

AWES SHEIKHUNA,
aka Awes Sheikhuma,
*Defendant-Appellant.*

Multnomah County Circuit Court
15CR25774; A164153

492 P3d 659

Defendant appeals a conviction for first-degree assault, ORS 163.185, and first-degree criminal mistreatment, ORS 163.205. Defendant assigns error to the trial court's denial of his motion for judgment of acquittal on both counts. Defendant argues that the evidence was insufficient to prove that he intentionally or knowingly caused injury to his three-month-old infant, who suffered catastrophic brain damage while in his care. *Held*: The evidence presented by the state was sufficient to support a finding that defendant acted with a "knowingly" mental state, because the evidence supported an inference that the cause of the infant's injures was assaultive in nature and that defendant would have been aware of the assaultive nature of his conduct. The trial court did not err in denying defendant's motion.

Affirmed.

Bronson D. James, Judge.

Meredith Allen, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and DeVore, Judge, and Aoyagi, Judge.*

DeHOOG, P. J.

Affirmed.

_____
* DeVore, J., *vice* Hadlock, J. pro tempore.

**DeHOOG, P. J.**

Defendant's three-month-old infant suffered cata-strophic brain damage while in defendant's care. Defendant was tried by a jury and now appeals a judgment of conviction for first-degree assault, ORS 163.185, and first-degree crim-inal mistreatment, ORS 163.205, raising four assignments of error. We reject his first and second assignments of error without discussion. We write to address his third and fourth assignments, in which he contends that the trial court erred in denying his motion for judgment of acquittal (MJOA) on both counts, because, in his view, the evidence was insuf-ficient to prove that he intentionally or knowingly caused injury to the child. As explained below, we conclude that the trial court did not err in denying defendant's MJOA, and, therefore, we affirm.

In a supplemental assignment of error, defendant asserts that instructing the jury that it could return nonunanimous guilty verdicts constituted a structural error requiring reversal. Although the instruction violated the Sixth Amendment, *Ramos v. Louisiana*, 590 US ___, ___, 140 S Ct 1390, 1396, 206 L Ed 2d 583 (2020), the Oregon Supreme Court has held that providing a nonunanimous jury instruc-tion is not a structural error that requires reversal in every case, *State v. Flores Ramos*, 367 Or 292, 319, 478 P3d 515 (2020). The verdicts here were unanimous, and, therefore, the error was harmless. *Id.* at 329. We reject that supple-mental assignment.

When reviewing a trial court's denial of an MJOA, "we view the evidence in the light most favorable to the state to determine whether a rational trier of fact, making rea-sonable inferences, could find the essential elements of the crime beyond a reasonable doubt." *State v. Peterson*, 309 Or App 31, 34, 482 P3d 68 (2021) (internal quotation marks omitted). "Where the state has sought to establish an ele-ment of the crime by reasonable inference, whether suffi-cient evidence supports the inference is a question of law for the court." *State v. Garibay*, 307 Or App 722, 724, 478 P3d 1006 (2020) (internal quotation marks omitted). We state the pertinent facts accordingly.

The victim in this case is defendant's son, N, who was three months old at the time of the incident giving rise to defendant's convictions. N suffered a traumatic brain injury, a ligamentous spine injury, and bruising on his thigh. Most of his brain tissue died; he is blind, cannot understand anything that is spoken to him, cannot make intentional body movements, has no sensation of touch, cannot make or retrieve memories, and is fed through a feeding tube. The part of his brain that is intact, the brainstem, controls his respiration and heartbeat.

N's mother, Gallow, and defendant, both of whom immigrated to the United States as adults, are married under the cultural practices of their native country. They have two children together: N, and N's brother, H, who is a year older than N. At the time of the underlying incident, Gallow lived in an apartment with the two children and worked the swing shift as a janitor. Defendant did not live with Gallow and the children, but he would come to her apartment and provide childcare while she was at work. N was a fussy baby. Unlike H, who was a calm and good baby, N cried a lot.

On June 15, 2015, Gallow cared for the children in the morning and left for work that afternoon at around 3:00 p.m. Defendant cared for the children after Gallow left. According to Gallow, N had been sick in the days leading up to June 15; he was crying a lot, throwing up, would not take milk, and had been running a fever. The night before, "he was fussing so much [Gallow] didn't get enough sleep." That afternoon, defendant took N to an urgent care appointment with a physician's assistant, Norman, at the medical office where N had been seen two prior times.

Norman understood that defendant had brought N in for the appointment because he had nasal congestion and was not feeding properly. Norman performed a physical exam on N that included an examination of N's head, which did not raise any concerns for Norman. N was alert, was not lethargic, and did not exhibit any difficulty breathing. Norman noted that N had nasal congestion, and she showed defendant how to clear N's nasal passages so that he could eat while breathing through his nose.

After the medical appointment, defendant returned
to the apartment with the two children. According to defen-
dant, N continued to cry and would not take his bottle; at
some point defendant put N in an infant swing. At 6:11 p.m.,
defendant called 9-1-1 and requested an ambulance. He told
the dispatcher that he had "a little kid here" and that "some-
thing is wrong with him." He said, "I don't know what's going
on with this kid. He can't even take breaths." He also reported
that "it almost seems like he's died," and "he doesn't cry. He
doesn't move." An ambulance was dispatched, and N was
transported to Oregon Health & Science University (OHSU)
hospital. Upon arrival in the emergency department, N was
minimally responsive and had minimal breathing; he was
immediately intubated and ventilated, and he was in very
serious condition and unstable for the first 24 to 36 hours.
N was eventually admitted to the pediatric intensive care
unit (PICU) at OHSU Doernbecher Children's Hospital. He
spent approximately six weeks in the hospital, and multiple
physicians independently diagnosed him with abusive head
trauma.

Due to N's injuries, defendant was indicted on one
count of first-degree assault, ORS 163.185(1), for "unlaw-
fully, intentionally and knowingly caus[ing] serious physi-
cal injury to [N], a child under six years of age," and one
count of first-degree criminal mistreatment, ORS 163.205,
for "unlawfully and intentionally and knowingly caus[ing]
physical injury to [N]" "in violation of a legal duty to provide
care for and having assumed the care, custody and respon-
sibility for the supervision of [N], a dependent person." He
proceeded to a jury trial.

At trial, the state's theory was that N had been
seriously injured sometime between leaving his primary
care physician's office and the call to 9-1-1. According to the
state, defendant, who was the only adult with N during that
time, did *something* to cause the injuries to N. The state rea-
soned that, although there had been no witnesses to what
exactly had taken place—that is, other than defendant, N,
and possibly N's brother—whatever defendant had done had
to have been assaultive in nature and defendant would have
been aware of the assaultive nature of his own conduct. To
support that theory, the state called witnesses to describe

N's injuries and the level of force and mechanism that would have been necessary to cause those injuries.

Dr. Thomas Valvano, a physician who is board certified in general pediatrics and in child abuse pediatrics and who works in the Suspected Child Abuse and Neglect Program (SCAN) at Doernbecher Children's Hospital, testified. After N was brought to the hospital, the SCAN team was asked to consult on his case. Valvano was the doctor on call that evening, and he received a call from the emergency department; he saw N in person for the first time the next day. Ultimately, after ruling out other potential diagnoses, Valvano diagnosed N as having suffered an abusive head trauma[1]—a diagnosis that was clear cut in this case and that Valvano had no question about. Valvano explained that "abusive head trauma" is a recognized medical diagnosis and that it means

> "injury to the head and specifically the brain. That results from acceleration/deceleration type forces to the brain that causes brain injury and often constellation of other findings, as well, including hemorrhage, bleeding around the brain, often bleeding in the retinas of the eyes, and less commonly but also *** things like fractures, the most common being rib fractures and possibly, but not necessarily, other injuries to other parts of the skin or the body."

Valvano also explained that the term "shaken baby syndrome" was commonly used until 2009

> "to describe the injuries we see from abusive head trauma. Shaking is one of the mechanisms of inflicting this kind of trauma on an infant, and so that was a term that was commonly used both medically and by—in the press and by, you know, just as sort of a common term that you would hear about, but it doesn't really fully encompass the scope of abusive head trauma because we know that you can inflict

---

[1] Valvano's written assessment states that N

"is a three-month-old male with global hypoxic brain injury, bilateral, subdural and subarachnoid hemorrhages and bilateral retinal hemorrhages. These injuries are highly suspicious for abusive head trauma. No underlying medical disorder has been found. [N] also has bruising to the right medial thigh. He has hemorrhage and ligamentous injury consistent with traumatic injury to the thoracolumbar spine. [N's] presentation is consistent with a diagnosis of nonaccidental trauma."

these injuries on an infant without just shaking or without shaking at all, so shaking is one of the mechanisms but not the only mechanism that can result in the findings we see with abusive head trauma, so \*\*\* we're now using a broader term in recognition of the fact that there's more than one way to inflict these injuries."

Valvano testified that the "Number 1 trigger" for inflicted (nonaccidental) trauma in infants is infant crying. When explaining the difference in symptoms that a child would exhibit with an accidental head trauma compared to an inflicted head trauma, Valvano said that inflicted head trauma tends to be "deeper, more severe and have more significant consequences. It tends to be more diffuse, affecting the entire brain, and specifically with inflicted head trauma [they] often see \*\*\* other findings, such as retinal hemorrhages and subdural hemorrhages," whereas common accidental head traumas, like a fall from a changing table or a fall from a window, might involve a contusion to the head or a simple linear skull fracture—the injuries tend to be localized to one particular part of the head or the brain.

Valvano testified that N had a traumatic injury to the ligaments of his spine, which contributed to Valvano's impression that N's overall presentation was not consistent with accidental trauma. Regarding the mechanism of injury, he stated that the trauma to the spine could "either be from direct impact or from hyperextension or flexion, so extreme bending or stretching of the spine" could cause the kind of ligamentous injuries N had. Another consideration in N's diagnosis was that N had severe bilateral retinal hemorrhages (bleeding) in his eyes, and Valvano explained that those hemorrhages were in "a textbook pattern associated with abusive head trauma" and that acceleration/deceleration forces cause traction and breakage of the blood vessels within the eye, and hemorrhages occur within all layers of the retina; there are "so many hemorrhages that you can't count them all." He testified that, although there might be a number of causes of retinal hemorrhages in general, "there are very, very few things that cause this extensive pattern of retinal hemorrhages." He listed the other possibilities, aside from abuse, as including leukemia, fatal motor vehicle collisions, and crushing head injuries—like a television

falling on the head and crushing it. He also testified that minor and moderate accidental trauma—like falling out of a window, falling one story off of a balcony, and falling down a set of stairs—has not been shown to cause the type of retinal hemorrhaging that N had.

Valvano also testified that N had bleeding on both the left and right sides of his brain and in multiple areas around the brain. That bleeding was consistent with an "acceleration/deceleration force that's affecting the entire brain as opposed to a contact force from an impact or a fall that just affects the part of the head that came into contact." The acceleration and deceleration cause small blood vessels to tear, resulting in them bleeding into the space around the outside of the brain. Valvano explained that the entire brain experiences the acceleration/deceleration forces and that there is trauma to the brain tissue itself and to the nerves and cells of the brain, which die. A cycle of events follows, including swelling of the brain leading to a loss of brain function, which in turn leads to other bodily functions— such as breathing—working less effectively.

Valvano testified that although the medical community cannot quantify the amount of force necessary to cause injuries like N's, because it would be inappropriate and unethical to test on babies, they know that certain kinds of mild to moderate forces, such as short-distance falls onto a hard floor—even falls causing skull or extremity fractures—have not led to neurologic symptoms or to a need for intensive care. In addition, Valvano stated that swinging in an infant swing would not cause the types of injuries that N had, nor would bouncing a baby on your knee or tossing and catching a baby in the air. During cross-examination, Valvano was asked about research studies that included shaking or trauma to a child during a revival process—a "rescue shake"—and he stated that he did not find those reports to be credible because "if you have a sick baby you're not going to shake that baby violently enough to cause the kind of trauma that we see in abusive head trauma" situations, but that it is sometimes used as an excuse when a baby is injured. That is, to cause the kinds of injuries N had required a "violent force."

Valvano was asked about the information that defendant and Gallow had provided to him about events leading up to N's admission into the hospital. Neither parent provided any explanation involving an accidental or any other trauma. When defendant called 9-1-1, he reported that N was breathing funny—gasping for air—and was limp when defendant picked him up; he said that N's eyelids were half open and his eyes were rolled back in his head. When asked whether N's presentation, as described by defendant, was consistent with a child that had been subjected to significant acceleration/deceleration forces, Valvano testified that it "certainly could be" and went on to state that common presentations for a child who has just sustained a brain injury include apnea or respiratory distress, limpness, and altered mental status, such as not being responsive or interactive. Valvano testified that, in his opinion, the injury to N occurred sometime between when he left his primary care provider's office and when defendant called 9-1-1.

The state also called Dr. David Pettersson to testify. He is an assistant professor of neuroradiology—a branch of diagnostic radiology—at OHSU, and he reads all of the brain and spine imaging for children and adults at OHSU, which includes CT and MRI scans. Pettersson read N's CT and MRI scans throughout his stay at the hospital. Pettersson explained that the CT scan from the day of N's admission showed recent brain tissue death for all but the cerebellum portion of his brain[2] and an MRI scan confirmed brain tissue death. Pettersson testified that he could see retinal hemorrhage on the MRI scan. In regard to MRI imaging of N's spine, Pettersson testified that there was a finding of a ligament disruption injury and an area of bleeding in the soft tissues nearby that indicated a "focal traumatic injury at that location." When asked if that ligament injury was something that "could just spontaneously happen with no external forces being applied," he responded, "No way." Pettersson was also asked about the amount of force that would be necessary to cause the spinal ligament injury. He stated that it would be a force strong "enough to break the

---

[2] Pettersson explained that the cerebellum is the small part of the brain that sits low in the back part of the head and the cerebrum is the dominant part of the brain that sits higher up in the head.

soft tissues" and that it was a flexion injury; he described how it was similar to an injury from a seatbelt in a motor vehicle accident when cars just had lap belts and in which the ligament would widen and break. He formed an independent opinion about N's diagnosis based on the CT and MRI scans:

> "[N]onaccidental trauma would be the leading diagnosis based on all these findings. There are findings of definitive trauma on the scan and the extent of injury without an explanation for the mechanism of injury, like a high-speed motor vehicle accident or a fall from like several stories up on a building. The nonaccidental trauma would be the leading—would be the leading consideration."

Pettersson also testified that the timing of the injury would have had to have been after N's visit to his primary care provider because he could not have "that global brain death injury" and have a normal physician visit.

At the conclusion of the state's case, defendant moved for a judgment of acquittal on both counts. Defendant asserted that there was a lack of evidence as to what act he had allegedly engaged in. Defendant also argued that there was insufficient evidence as to the amount or level of force that would have been necessary to cause the child's injuries. He emphasized that, for both of the charged offenses, the culpable mental state is "intentionally or knowingly" and argued that the state had not presented sufficient evidence for the jury to find that whatever defendant had done rose to that level of culpability.

In response, the state argued that it had to prove that defendant intentionally or knowingly caused serious physical injury, and that for the "knowingly mental state," the state needed only to prove that defendant knowingly engaged in the assaultive conduct that led to the serious physical injury. In regard to the level of force required, the state argued that it had presented sufficient evidence by way of the testimony of multiple medical professionals who had provided their diagnoses of abusive head trauma and had explained the mechanism of force that leads to such head trauma. The state further argued that there was testimony that, given the type of brain death N suffered and the

amount of damage and overall injury to his body, the onset of symptoms would have been immediate. In addition, the state pointed out that defendant was the only caretaker of N at the time N became symptomatic and 9-1-1 was called.

The trial court denied defendant's MJOA:

"In the light most favorable to the State and all the infer-ences that flow therefrom—and this is a case that is built on inferences, I think by its nature, but I do believe that there is sufficient evidence to go to the jury on each of the charges so I will be denying the motion for judgment of acquittal."

The jury found defendant guilty of first-degree assault and first-degree criminal mistreatment; both ver-dicts were unanimous.

On appeal, defendant contends that the trial court erred in denying his MJOA on both counts, raising the same legal arguments for each. We address them together as the parties did in their briefing. As applicable here, ORS 163.185(1)(b) provides that a "person commits the crime of assault in the first degree if the person: *** [i]ntention-ally or knowingly causes serious physical injury to a child under six years of age." Under ORS 163.205(1)(b), a "per-son commits the crime of criminal mistreatment in the first degree if: *** [t]he person, in violation of a legal duty to provide care for a dependent person *** or having assumed the permanent or temporary care, custody or responsibility for the supervision of a dependent person ***, intentionally or knowingly: (A) [c]auses physical injury or injuries to the dependent person."

Defendant argues that the state did not present sufficient evidence of his mental state—that he acted inten-tionally or knowingly with respect to causing N's injuries.[3] That is so, according to defendant, because the state failed to present evidence of what particular conduct he had engaged in to cause N's injuries and because the most likely cause of injury—shaking—is not inherently assaultive.

---

[3] We note that, as charged here, first-degree assault requires a "serious phys-ical injury" and first-degree criminal mistreatment requires a "physical injury." There is no dispute here that N suffered a serious physical injury. For purposes of our combined legal analysis on both offenses, we refer simply to physical injury.

Therefore, defendant reasons, it is impermissibly speculative to infer that defendant was aware that his conduct was assaultive in nature. Defendant also argues that there is no basis to infer that he intended for injury to occur. The state argues in response that it did not have to prove precisely what defendant did, and that on the record here, given the testimony about the significant force that would have been necessary to inflict such a severe injury, and given that N was a three-month-old infant, the jurors rationally could infer that whatever defendant might have done he had done intentionally or knowingly.

As we explain below, we conclude that the evidence was sufficient to support a jury's finding that defendant acted with a "knowingly" mental state and affirm on that basis.[4] "Knowingly" is defined as acting "with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists." ORS 161.085(8). To prove that defendant knowingly caused physical injury to N, the state needed "to prove only that defendant was aware of the assaultive nature of his conduct and that his conduct in fact caused the victim" physical injury; the state did not need to prove that defendant had an awareness of what the result of his conduct would be. *State v. Barnes*, 329 Or 327, 337-38, 986 P2d 1160 (1999); *see State v. Allen*, 311 Or App 271, 294, 489 P3d 555 (2021) (holding that *Barnes* controlled when the defendant was charged with a knowingly mental state for purposes of first-degree assault under ORS 163.185(1)(b) and first-degree criminal mistreatment under ORS 163.205(1)(b)(A)); *see also State v. English*, 269 Or App 395, 399-400, 343 P3d 1286 (2015) (applying *Barnes* to "knowingly causes physical injury" for first-degree criminal mistreatment, ORS 163.205(1)(b)(A)).

---

[4] In his reply brief, defendant raises an additional argument for the first time. He asserts that if we determine that the evidence is sufficient to support defendant's knowing mental state but insufficient to prove his intentional mental state, we cannot affirm the convictions. We reject that argument because it is unpreserved and because we will generally not consider an argument made for the first time in a reply brief. *See* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief[.]"); *see also State v. Murga*, 291 Or App 462, 468, 422 P3d 417 (2018) ("We have long held that arguments raised for the first time in a reply brief normally will not be considered.").

We have an "obligation to distinguish between infer-
ences that can be reasonably drawn from the evidence and
inferences that are mere speculation." *State v. Hedgpeth*,
365 Or 724, 732, 452 P3d 948 (2019). As the Supreme Court
has explained, when considering an MJOA, the question is
"whether the factfinder reasonably could infer that a par-
ticular fact flows from other proven facts, not whether the
inference *necessarily* flows from the proven facts." *Id*. at 733
(emphasis in original).

Defendant argues that the state's reasoning—that
the jurors could rationally infer that whatever defendant did
he did intentionally or knowingly—depends on impermissi-
ble stacking of inferences and speculation. He contends that
shaking, the most likely cause of injury, is not inherently
assaultive and that the state failed to prove that defendant's
conduct had a "classically" assaultive nature such that any-
one would be aware that he was engaging in assaultive con-
duct. He relies on our decision in *English* in support of that
argument.

In *English*, the defendant was convicted of two
counts of first-degree criminal mistreatment based on inci-
dents in which a dog owned by the defendant's boyfriend
had bitten the defendant's daughter. 269 Or App at 397.
The dog had a history of biting children, and the defendant
was aware of that history. Nonetheless she did not remove
the dog from her home or keep her daughter away from
the dog. On appeal, the state argued that the defendant's
omission—failing to remove a dangerous dog—could consti-
tute an assaultive act. *Id*. at 400-01. We stated that, unlike
the conduct in *Barnes*, which had been punching a person
in the eye, the defendant's conduct in *English* was not of a
"classically 'assaultive nature'; rather than directly inflict-
ing injury on [the victim], defendant exposed [the victim]
to the dog, an intervening actor, and the dog inflicted the
injury." *Id*. at 401. We reversed the defendant's convictions,
because nothing about the history of the dog permitted "an
inference that defendant knowingly engaged in assaultive
conduct or acted with an awareness that she was assault-
ing" someone when she allowed her daughter and the dog to
ride together in a car. *Id*. at 403.

Here, although we agree with defendant that not all shaking would be of a classically assaultive nature, *e.g.*, one could "shake" someone to wake them up without that conduct being assaultive, the evidence presented by the state in this case supports an inference that the cause of N's injuries was assaultive in nature and that defendant would have been aware of its assaultive nature. In Valvano's testimony that shaking was one of the mechanisms that cause abusive head trauma, he implied that abusive head trauma was caused by *violent* shaking. He testified that it is acceleration and deceleration forces that cause blood vessels in the brain and the eyes to break and bleed and that "extreme bending or stretching of the spine" could cause the kind of ligamentous injuries N had. Valvano explained that the amount of force required to cause the injuries that N had was not mild or moderate, but rather, a "violent force." For example, the retinal hemorrhaging N experienced is of the type caused by a fatal motor vehicle collision or a crushing head injury. Valvano also provided examples of the kinds of actions that would not cause the kinds of injuries that N had, such as swinging in an infant swing, bouncing on a knee, being tossed into the air and caught, falling a short distance onto a hard floor, or falling down a set of stairs. And, in addition, Valvano explained how accidental injuries, like a fall, generally present as a more localized injury rather than the global type of injury that N experienced.

The state also presented testimony from Pettersson that was consistent with Valvano's testimony. Pettersson agreed that the ligament injury to N's spine was not something that could spontaneously happen without external force being applied, explained that it was a flexion injury similar to the kind of injury caused by a lap seatbelt in a car collision, and equated the amount of force necessary to be like that in a motor vehicle accident or a fall from several stories up in a building.

We have previously acknowledged that "[t]he difference between a reasonable inference and impermissible speculation is not always easy to describe with precision" and that such a determination depends on the facts and circumstances in a particular case. *State v. Rogers*, 301 Or

App 393, 399, 400, 457 P3d 363 (2019) (internal quotation marks omitted). Here, based on the medical testimony, we conclude that it was not speculative for the jury to infer that N's injuries were caused by shaking, or some other applied acceleration/deceleration force, and that that conduct was violent in nature. Given the violent nature of the conduct that would have necessarily taken place here, it was reasonable for the jury to infer that defendant had an awareness of his own bodily movement and an awareness that his violent action was assaultive to his three-month-old child. We agree with the trial court that the evidence here was sufficient to permit reasonable inferences on which a jury could base a finding that defendant knowingly caused physical injury to N, and the court did not err in denying defendant's MJOA as to both counts.

Affirmed.