Argued and submitted March 10, decision of Court of Appeals reversed, and case remanded to Court of Appeals for further proceedings December 22, 2022

STATE OF OREGON,
*Petitioner on Review,*

*v.*

H. D. E.,
*Respondent on Review.*

(CC 19CR07787) (CA A171975) (SC S068885)

522 P3d 829

Defendant was convicted of Initiating a False Report, ORS 162.375, based on evidence that she had contacted the police to report another person's criminal conduct and that much—but not all—of what she reported was false. On appeal, she argued that she was entitled to a judgment of acquittal because there was no evidence that her false statements to the police had resulted in any greater expenditure of police resources than would have resulted if she had excluded those false statements from her report. The Court of Appeals agreed and reversed defendant's conviction: It concluded that, when a person's report to the police contains both true and false statements, the person can be convicted of initiating a false report under ORS 162.375 only if the state proves that the false statements resulted in an expenditure of investigatory resources beyond that which would have resulted based on the true statements alone—and because the record was silent on that point, defendant was entitled to a judgment of acquittal. The state sought review, arguing that any true statements defendant had made were irrelevant and that her false statements constituted a "false report" in their own right because they informed the police of a current crime or emergency to which the police were likely to respond. *Held*: The state was not required to prove that defendant's false allegations caused law enforcement to devote greater or different resources to the investigation of defendant's report than it would have devoted had she only made the true allegations, and the trial court did not err in denying defendant's motion for judgment of acquittal.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

En Banc

On review from the Court of Appeals.*

Stacy M. Chaffin, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

_____

* Appeal from Umatilla County Circuit Court, Jon S. Lieuallen, Judge. 313 Or App 356, 493 P3d 1123 (2021).

Peter G. Klym, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for respondent on review.  Also on the brief was Ernest G. Lannet, Chief Defender.

DeHOOG, J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

**DeHOOG, J.**

In this case, we again consider the crime of initiating a false report, an offense committed when a person "knowingly initiates a false alarm or report that is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property." ORS 162.375(1). The trial court convicted defendant of that crime based on evidence that she had triggered a police investigation by making a call and subsequent statements to the police that included both true and false allegations against another person. On appeal, defendant argued that the trial court should have granted her motion for judgment of acquittal because much of what she had reported to the police had been true and there was no evidence that her false statements had resulted in any greater expenditure of police resources than would have resulted had she not made them. The Court of Appeals agreed with defendant and reversed the judgment of conviction; the state now seeks review of that decision by this court. For the reasons that follow, we hold that the trial court properly denied the motion for judgment of acquittal and that the Court of Appeals therefore erred in reversing on that ground.[1]

## I.   BACKGROUND

Viewed in the light most favorable to the state,[2] the facts relevant to defendant's conviction under ORS 162.375 are as follows. On August 27, 2018, defendant called the Hermiston Police Department's nonemergency number and reported that an individual—a doctor—"had assaulted her

---

[1] In the Court of Appeals, defendant challenged her conviction on a second ground—a claim of evidentiary error. Having concluded that defendant was entitled to reversal on the ground that the trial court had erred in denying defendant's motion for judgment of acquittal, the Court of Appeals did not reach that second claim of error. *State v. H. D. E.*, 313 Or App 356, 358 n 1, 493 P3d 1123 (2021). We remand to the Court of Appeals for consideration of that second claim of error, as defendant has requested we do if we reverse the Court of Appeals' decision.

[2] *See State v. Hedgpeth*, 365 Or 724, 730, 452 P3d 948 (2019) (The "standard for reviewing the denial of a motion for judgment of acquittal involves viewing the evidence in the 'light most favorable to the state' to determine if the 'state presented sufficient evidence from which a rational trier of fact, making reasonable inferences,' could find the essential elements of the crime beyond a reasonable doubt." (Quoting *State v. Clemente-Perez*, 357 Or 745, 756, 762, 359 P3d 232 (2015).)).

[two] children by pushing them and getting in their faces and yelling at them," and that "he was verbally abusive as well." She agreed to come to the police department to file a report. When defendant arrived about 30 minutes later, Officer Wallis, who had been dispatched to take her report, met her in the lobby. Defendant told Wallis that the doctor that she had identified had "assaulted" two of her children. She explained that she and her children had been in the waiting room of the doctor's medical office, and she acknowledged that the children had been playing "a little loudly." Defendant said that, as a result, the doctor had come out into the waiting room and gotten "inches from their face, *** yell[ed] at them, [and] cuss[ed] at them"; had pushed her daughter's leg "as hard as he could"; had shoved her son into a refrigerator that was located in the lobby; and, when defendant approached the doctor and berated him for touching her children, had gotten "an inch from her face" and told her that it was "his fucking office and nobody [was] going to tell him what to do." Defendant told Wallis that she wanted the doctor to be charged with assault. When Wallis explained to her that unwanted touching, without physical injury, might be "harassment" but not assault, she asked him whether she needed to contact her lawyer, a comment that Wallis took to be a threat to sue the police department if he did not arrest the doctor.

Wallis gave defendant his business card before going to the doctor's office to investigate her allegations. There he interviewed the doctor, who acknowledged having confronted defendant's children but denied having shoved them. While at the medical office, Wallis learned that there was a surveillance camera in the waiting room that likely would have recorded the incident reported by defendant. Wallis watched the videorecording, but what he saw "didn't seem to *** match *** [defendant's] statements[.]"

The next day, defendant telephoned Wallis to tell him that, the night before, she had taken her son to the emergency room (ER) after he complained that his head hurt. She told Wallis that her son had been diagnosed with injuries—a contusion and a possible concussion—which, she insisted, had resulted from the doctor's assault. Wallis met with defendant and her son so that he could examine the

child's head injury. Although defendant pointed at an area on her son's head as a purported site of injury, Wallis was unable to see any bruising, swelling or redness there, and no such evidence of injury appears in photographs that Wallis took at the time.

Several months later, the doctor received a letter from defendant stating that she intended to sue him for $864,000 in damages over the waiting-room incident and noting that the incident, along with the ER visit, had been reported to the police. Defendant indicated in the letter that she was "willing to settle out of court."

## II.  PROCEDURAL HISTORY

The state charged defendant with two counts of initiating a false report, ORS 162.375.[3] The state eventually dismissed the second count, which related to defendant's contacts with Wallis the day after the alleged incident. Defendant tried the first count—which related to her initial call to the police department and contacts with Wallis on the day of the alleged incident—to the court. At trial, the state presented testimony from both the doctor and Wallis. The doctor acknowledged having scolded the children and having inadvertently touched the boy's leg as he bent down to pick up a toy, but he denied having pushed either child. Wallis testified regarding his own interactions with defendant as described above. The state also introduced the video-recording of the incident, which the trial court viewed.

At the conclusion of the state's case-in-chief, defendant moved for judgment of acquittal. Defendant argued that, in her report to the police, she had accurately described conduct by the doctor that would, at a minimum, have constituted the crime of harassment. In defendant's view, even if her report of an assault by the doctor had been false, adding those false allegations to an otherwise truthful report of the crime of harassment would not constitute initiating a

---

[3] ORS 162.375(1) provides:

"A person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report that is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property."

false report within the meaning of ORS 162.375. The trial court denied defendant's motion with little explanation. At the conclusion of trial, the court found defendant guilty, discussing that decision at greater length and explaining that its verdict was based solely and specifically on defendant's assertion that the doctor had "assault[ed]" her children.[4]

Defendant appealed, arguing that the trial court had erred in denying her motion for judgment of acquittal. Relying on our decision in *State v. Branch*, 362 Or 351, 408 P3d 1035 (2018), she argued that she could not be guilty of initiating a false report, because, as the trial court had purportedly found, she had truthfully reported conduct that constituted the crime of harassment, and her additional *false* statements about assaultive conduct had not alleged "circumstances to which the law enforcement agency [was] reasonably likely to respond as a current separate crime or emergency *in itself*." *Branch*, 362 Or at 368 (emphasis added).

The state responded that defendant had reported two kinds of conduct by the doctor—yelling and forcible shoving—and contended that her report of forcible shoving qualified as a false report in its own right because it informed the police of a current crime or emergency to which the police were likely to respond.

Like defendant, the Court of Appeals in this case focused on *Branch*. Based on our interpretation of ORS 162.375 in that case, the Court of Appeals observed that, "when a criminal investigation is already underway, a person does not violate ORS 162.375 'by falsely confirming or denying knowledge of a report or alarm that already is under investigation, or by falsely conveying information about circumstances to which the agency would be unlikely to devote resources, except for whatever relevance the information

---

[4] Defendant contends that, by limiting its verdict to the allegations of assault, the trial court implicitly found that she had truthfully reported conduct constituting the crime of harassment and that the police would likely have investigated that allegation even if she had not also alleged assaultive conduct. The state implicitly agrees with that characterization of the court's decision. In our view, however, the court may simply have assumed without deciding that defendant's allegations stated the crime of harassment. Because it is not material to our analysis, we similarly accept for purposes of discussion that view of the court's decision, but we do not address the legal merit of any such ruling.

may have to an existing criminal investigation.'" *State v. H. D. E.*, 313 Or App 356, 360, 493 P3d 1123 (2021) (quoting *Branch*, 362 Or at 362). Given that understanding of *Branch*, the Court of Appeals then derived the following corollary:

> "[W]hen a criminal investigation is *not yet underway* at the time of a report containing both true and false statements, to prove that a defendant initiated a false report through the inclusion of the false statements, the state must prove either that (1) the false statements resulted in an expenditure of investigatory resources beyond that which would have resulted based on the true statements alone; or (2) if no investigation occurs, that the false statements would have 'start[ed] the ball rolling' on an expenditure of resources beyond that which would have been triggered by the true statements alone."

*H. D. E.*, 313 Or App at 360-61 (second brackets in *H. D. E.*; emphasis added). Applying that rule, the court held that defendant could not be convicted of initiating a false report unless her false statements regarding an assault had triggered an expenditure of law enforcement resources beyond those triggered by her truthful report of harassment. *Id.* at 362. Because the record was silent on that issue, the Court of Appeals concluded that no rational trier of fact could find "that defendant's false statements on their own resulted in a law enforcement response different in scope from that which would have resulted from the true statements on their own," meaning that she was entitled to a judgment of acquittal. *Id.*

### III.   THE PARTIES' ARGUMENTS

On review, the state contends that neither the text nor context of ORS 162.375 supports the Court of Appeals' interpretation of that statute. The state further argues that, by requiring the state to prove an unnecessary expenditure of police resources under the circumstances of defendant's case, the Court of Appeals has effectively adopted an additional element that is not found in the statutory definition of initiating a false report and was not contemplated by the legislature in enacting ORS 162.375. In the state's view, that statute requires proof of only the following express elements: Defendant (1) "knowingly" (2) "initiate[d]" (3) a "false alarm

or report" that (4) was "transmitted" to (5) an "organization that deals with emergencies involving danger to life or property." Here, the state contends, those elements were satisfied when defendant falsely reported to the police that the doctor had assaulted her children. The state further argues that, to the extent that defendant's report happened to include truthful allegations of harassment, that is immaterial to whether defendant's false allegations of assault constituted a "false *** report" within the meaning of the statute.

Defendant disputes the state's assertion that the Court of Appeals' decision effectively requires proof of a new element. According to defendant, that opinion merely explains how an established element—the requirement of a "false *** report"—can or cannot be proved under various circumstances. Defendant contends that, because ORS 162.375 is solely directed at the waste or misdirection of police and emergency resources caused by false alarms and reports, a "mixed" report including both true and false allegations is not a "false *** report" unless the false allegations themselves would trigger such waste or misdirection, which, in this case, would mean an expenditure of police resources different from, or greater than, the expenditure of resources likely to have resulted from defendant's truthful allegations alone. Defendant argues that, because her true and false allegations described offenses having common elements or encompassing similar conduct—meaning, in her view, that any police response would likely have been the same with or without the false allegations—her statements to the police did not satisfy the requirement of a "false *** report."

## IV.  ANALYSIS

The parties' dispute raises a question of statutory interpretation: Can a false allegation of a crime that is transmitted to the police constitute a "false *** report" under ORS 162.375 if it is accompanied by the truthful allegation of another crime that is itself likely to trigger a similar expenditure of police resources? To answer that question, we apply our standard methodology, examining the statutory text in context, together with any helpful legislative history, and considering any applicable maxims of statutory

interpretation if the statute's meaning remains ambiguous following that inquiry. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

## A. *Text and Context*

For purposes of that analysis, we begin with the disputed text: "false report." That term, or more accurately, the phrase "false alarm or report,"[5] is found within the first subsection of ORS 162.375, which defines the crime of "initiating a false report" as follows:

> "A person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report that is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property."

ORS 162.375(1). The term "false report" itself provides little guidance. It informs us that, to be prohibited, a conveyance must in some way be "false," but it does not indicate whether a false allegation of crime that is accompanied by a truthful allegation of another crime may nonetheless be a "false report." Certainly, however, the ordinary meanings of the words "false" and "report" do not readily convey that only a report that results in an unnecessary expenditure of resources can qualify as a "false report," as defendant contends.[6]

Turning to the statutory context, the parties appear to agree that the text immediately following the "false report"

---

[5] Although the statutory element found in ORS 162.375 is a "false alarm or report," for convenience—and because only a "report" is at issue in this case—we use the shortened term "false report" throughout the remainder of this opinion.

[6] In *Branch*, we described the ordinary meaning of the word "report" in the following terms:

> "Dictionary definitions of the noun 'report' vary from the very casual ('common talk' and 'rumor') to somewhat formal ('something that gives information **:** a usu[ally] detailed account or statement ***') to formal ('a usu[ally] formal account of the results of an investigation given by a person or group authorized or delegated to make the investigation'). *** All of the definitions, however, describe a communication of information."

362 Or at 358 (Quoting *Webster's Third New Int'l Dictionary* 1925 (unabridged ed 2002) (brackets in *Branch*).). In addition, "false" is defined, in relevant part, as meaning "not corresponding to truth or reality" and, alternatively, "intentionally untrue." *Webster's* at 819.

reference provides at least some guidance as to that term's intended meaning. Both parties acknowledge our observation in *Branch* that the word "report" draws meaning from that context, which indicates that a "report" is a communication that informs a fire, police, or other emergency organization of a situation to which the organization would likely respond with an expenditure of resources. *Branch*, 362 Or at 361.

Defendant also relies on the broader context of ORS 162.375. She points first to the statute's penalty provisions, which, at subsection (3), provide:

"(a)   The court shall include in the sentence of any person convicted under [ORS 162.375] a requirement that the person repay the costs incurred in responding to and investigating the false report.

"(b)   If the response to the false report involved the deployment of a law enforcement special weapons and tactics (SWAT) team or a similar law enforcement group, the court shall impose, and may not suspend, a term of incarceration of:

"(A)   At least 10 days.

"(B)   At least 30 days if the deployment resulted in death or serious physical injury to another person."

ORS 162.375(3). Defendant contends that those penalty provisions suggest that a "false report" is one that would result in the needless or wasted expenditure of emergency resources, with the assumption being that resources expended in response to any true allegations of crime would not be wasted. Defendant notes that the entire subsection ties the penalties for initiating a false report to actual and needless expenditures by requiring, first, that persons convicted of the crime repay the organization's actual costs in responding, ORS 162.375(3)(a), and, second, that persons whose false reports cause certain kinds of resources to be deployed serve time in jail, ORS 162.375(3)(b). Defendant also reasons that, insofar as paragraph (3)(a) is phrased in terms of repaying "*the* costs" (as opposed to "any costs") incurred in responding to a false report, that provision necessarily *assumes* that a person convicted of that offense will have caused an unnecessary expenditure of resources in

response to the false report. (Emphasis added.) Defendant contends that the penalty provisions therefore indicate that the "false reports" that are subject to ORS 162.375(1) are reports that result in the unnecessary expenditures of emergency resources.

We disagree. As the state observes, the fact that the statute's penalty provisions expressly contemplate the amount and type of resources that are expended in response to a "false report" does not make those expenditures an aspect of the "false report" itself, nor does it make them a required element of the crime of initiating a false report. At most, the penalty provisions can be viewed as reflecting a general legislative concern with preserving emergency resources, which is something that no one disputes.

The parties also point to various other statutes that criminalize false statements, each contending that those statutes provide supportive context for their respective views. Defendant echoes our observation in *Branch*, 362 Or at 360, that a comparison of ORS 162.375 with various "perjury-type" statutes—which have the potential to criminalize almost any materially false statement made under oath or subject to some formal process—suggests that a "false report" for purposes of ORS 162.375(1) requires more than just a false statement. But while that might be true, it does little to advance defendant's assertion that a "false report" is necessarily one that results in wasted resources.[7] The state, on the other hand, points out two specific and related "perjury-type" statutes—ORS 162.065 and ORS 162.075—and argues that, insofar as they both criminalize the making of "a [singular] false sworn statement," they imply that a single false statement "may constitute a crime even when accompanied by other[,] true statements." But, even accepting the state's premise as to how those other statutes work, it is difficult to see what bearing that point might have on the meaning of "report" under ORS 162.375(1),

---

[7] Because it is undisputed that a police investigation took place in defendant's case, we, like the parties, focus on the first prong of the Court of Appeals' rule. *See H. D. E.*, 313 Or App at 360-62 (where an investigation occurs, the state must prove that "the false statements resulted in an expenditure of investigatory resources beyond that which would have resulted based on the true statements alone").

which, on its face, may contemplate a single statement or, as the state's prosecution theory in this case suggests, multiple statements, some of which are true, but at least one of which is false.

We, like the Court of Appeals, find that our opinion in *Branch* significantly informs our construction of ORS 162.375(1). *See State v. McAnulty*, 356 Or 432, 441, 338 P3d 653 (2014), *cert den*, 577 US 829 (2015) (when examining the text in context, "[w]e also consider this court's prior construction of the statutes at issue"); *State v. Cloutier*, 351 Or 68, 100, 261 P3d 1234 (2011) ("Our analysis of [the statute] is also informed by this court's prior construction of that statute or its predecessors.").[8] In *Branch*, the defendant had been involved in a car accident and had left the scene without performing his statutory duties to the other driver. Officers who arrived at the scene obtained information that enabled them to identify the defendant, and one of the officers went to the defendant's home to question him about his involvement. When asked why he had left the scene without exchanging information with the other driver, the defendant told the officer that the other driver had pointed a gun at him. The officer relayed that statement to another officer who had remained at the scene, who proceeded to investigate the reported use of a gun as a potential crime. After questioning the other driver and searching for a gun, that officer concluded that the defendant's story about the other driver had been false. As a result, the defendant was charged with and convicted of initiating a false report, ORS 162.375. 362 Or at 353-54. He appealed and later sought review by this court, arguing that, because he had made the false statements about the other driver in response to police questioning, he had not "initiate[d]" a false report within the meaning of that crime's statutory definition. *Id.* at 355-56.

In our decision, we proceeded to construe the phrase "initiates a false alarm or report" in ORS 162.375(1). We first determined that the legislature had intended the

---

[8] Although in *Branch* we construed the meaning of the phrase "initiates a false alarm or report" rather than just the term "false *** report," we consider that case relevant to our interpretation here, because it construed the phrase as a whole while contemplating the specific meanings of its constituent terms, including "report."

word "initiates" to have its ordinary meaning—"to mark the beginning of"—but that that determination did not resolve the issue. *Id.* at 357. We then turned to "report" and, based on that term's immediate context, inferred that it

> "refer[s] to a communication that informs a law enforcement agency or other emergency organization that a situation exists of a type to which the organization would respond with an expenditure of resources."

*Id.* at 361. We then relied on that understanding of "report" in our preliminary construction of the phrase "initiates a false alarm or report." We explained:

> "Text and context suggest that a person 'initiates a false alarm or report' if the person's communication 'begin[s]' or 'mark[s] the beginning of' informing the organization about the circumstances that are the subject of the report. In the context of questioning initiated by law enforcement, that suggested meaning includes, *at a minimum*, falsely reporting new circumstances to which the law enforcement agency is reasonably likely to respond as a separate, ongoing crime or emergency. Conversely, the text and context suggest that a person does not violate ORS 162.375 during law enforcement questioning by falsely confirming or denying knowledge of a report or alarm that already is under investigation, or by falsely conveying information *about circumstances to which the agency would be unlikely to devote resources, except for whatever relevance the information may have to an existing criminal investigation* (*i.e.*, by making a false statement that is not a 'report')."

*Id.* at 362 (brackets in original; emphases added).[9]

　　　Defendant understands the foregoing interpretation of ORS 162.375, and particularly the emphasized portion of the last sentence, to mean that a false report is one

---

[9] After ascertaining that the legislative history of ORS 162.375 confirmed that meaning, we restated the rule more succinctly:

> "[A]t a minimum, in the context of questioning initiated by law enforcement, a person 'initiates a false alarm or report' within the meaning of ORS 162.375, if the person falsely alleges new circumstances to which the law enforcement agency is reasonably likely to respond as a current separate crime or emergency in itself, not merely because the false information is relevant to the crimes or emergency about which the person is being questioned."

*Id.* at 368.

that would result in an agency expending resources that it would not otherwise have expended. Thus, in defendant's view,

> "* * * [A] report or alarm is only false for purposes of the statute if it would result in wasted or needless expenditure of responsive resources. Any false statements made during the report that do not independently give rise to wasted resources, do not constitute a new 'false alarm or report' because those statements did not 'get the ball rolling' on a misguided investigation. It is not a new criminal matter. Instead, the ball is rolling in the appropriate directi[on], investigating true allegations. If there are no false allegations that waste emergency resources, there is no 'false alarm or report' under ORS 162.375."

Defendant's reading of *Branch* is flawed. True, as defendant emphasizes, we stated there that a person does not violate ORS 162.375 by falsely communicating "circumstances to which the agency would be unlikely to devote resources" except for their relevance to an existing investigation. 362 Or at 362. In so stating, however, we were contrasting such statements with those that "falsely report[ed] *new circumstances* to which the law enforcement agency is reasonably likely to respond *as a separate, ongoing crime or emergency*[,]" *id.* (emphases added), which presumably *could* violate the statute. Nothing in *Branch* suggests that the analysis turns on whether a person's false statements resulted in a particular type or degree of investigation. Rather, it turns on whether the false statements relate to "new" crimes or emergencies, as opposed to being relevant only to crimes or emergencies that are already under investigation, because only then could the person have "initiate[d]" anything.[10]

Thus, to the extent that *Branch* informs our decision here, it tends to support the state's position. Although *Branch* did not involve a combination of true and false statements made in a single communication—or by the same person—that decision nevertheless suggests that,

---

[10] Here it is undisputed that, prior to defendant's first call to the Hermiston Police Department, there was no ongoing investigation concerning these circumstances.

in determining whether a person has initiated a "false report" for purposes of ORS 162.375(1), the relevant inquiry is whether the person has made one or more statements informing an emergency organization of a "crime," "emergency," or other "circumstance[]" to which the organization was likely to devote resources. *Branch* is therefore in accord with the state's contention that, if a person's false statement about a criminal episode would inform a law enforcement agency about a crime to which it would likely respond with an expenditure of resources, that statement may constitute a "false report" even if accompanied by truthful statements about the same event.

Moreover, our various articulations of the holding in *Branch* suggest that, if false statements are sufficient to allege "new," distinct crimes, they may qualify as "false report[s]" even if they *also* happen to be relevant to ongoing investigations. *See Branch*, 362 Or at 361 (stating that "false report" would not encompass "a statement that merely conveys information to which the agency would respond *only* because the information is relevant to an existing report or alarm" (emphasis added)); *see also id.* at 362 (a person does not violate ORS 162.375 "by falsely conveying information about circumstances to which the agency would be unlikely to devote resources, *except for* whatever relevance the information may have to an existing criminal investigation" (emphasis added)); *id.* at 368 (person initiates false report "if the person falsely alleges new circumstances to which the law enforcement agency is reasonably likely to respond as a current separate crime or emergency in itself, *not merely because* the false information is relevant to the crimes or emergency about which the person is being questioned" (emphasis added)). Thus, although *Branch* is, as defendant contends, instructive, the quoted pronouncements tend to undermine her assertion that, when a person concurrently conveys both true and false allegations comprising legally distinct but overlapping crimes, the false allegations qualify as a "false report" only if it leads to an "unnecessary" expenditure of resources. Under those circumstances, the logical police response would be to investigate the false statements *both* for their relevance to the separately (but falsely) alleged crime of assault *and* "for whatever relevance

the information may have to an existing criminal investigation," *Branch*, 362 Or at 362, not *solely* for its relevance to the existing investigation.

Finally, defendant's theory—premised as it is on a purported lack of evidence at trial that her false allegations led to an additional expenditure of resources—cannot easily be squared with *Branch*'s observation that it does not appear that "an actual response by the organization is an element of the crime" of initiating a false report. 362 Or at 359 n 4. The Court of Appeals may have sought to avoid that incongruity by stating an alternative rule, one that would allow for a conviction even "if no investigation occurs, *** [so long as] the false statements would have 'start[ed] the ball rolling' on an expenditure of resources beyond that which would have been triggered by the true statements alone," 313 Or App at 361. However, the overall effect of the Court of Appeals' rule is to require—at least in cases where an investigation does occur—an inquiry into any actual expenditure of resources, a factual inquiry of the sort typically associated with establishing the elements of a crime.

Ultimately, *Branch* does not support the interpretation of ORS 162.375(1) that defendant advances and that the Court of Appeals effectively adopted in its decision. Rather, *Branch* tends to support the state's contention that, for purposes of that statute, a "false report" may be a false allegation of criminal conduct made alongside a truthful allegation of a different crime, so long as the false statement is one to which law enforcement is reasonably likely to devote resources. Thus, preliminarily, at least, the statute appears to support the state's theory of prosecution in this case.

B.   *Legislative History of ORS 162.375(1)*

For further guidance, we turn to the legislative history of ORS 162.375(1), which defines the offense of "initiating a false report." Before addressing the parties' specific arguments regarding that history, we briefly discuss the provision's path to enactment.

ORS 162.375(1) was part of the 1971 Legislative Assembly's enactment of the revised Criminal Code, which

had been drafted, at its request, by the Oregon Criminal Law Revision Commission.[11] Subcommittee 2 of that commission, which had been assigned the task of drafting definitions for "Perjury and Related Offenses," drafted the provision that later became ORS 162.375(1). The initial draft before the subcommittee designated the crime as "Rendering a False Report." Preliminary Draft No. 1, Criminal Law Revision Commission, Subcommittee 2, Article 22, section 11 (May 1969) at 50.

Donald Paillette, the director of the revision project, proposed the specific language that, with certain minor changes discussed below, the legislature ultimately enacted. Paillette's draft provided:

> "A person commits the crime of rendering a false report if he knowingly causes a false alarm or report to be transmitted to a fire department, law enforcement agency, or other organization that deals with emergencies involving danger to life or property."

Minutes, Criminal Law Revision Commission, Subcommittee 2, Sept 16, 1969, 17-18. The subcommittee agreed to that wording. However, one member of the subcommittee, Representative Haas, expressed reservations that the wording could make any oral statement to a police officer—even one solicited by the officer—subject to prosecution. That, in his view, meant that "every time you talk to a police officer, you would, in essence, be testifying under oath, subject to the penalties of being prosecuted for your statement if it is in error." *Id.* at 18 (statement of Rep Harl Haas).

Paillette observed that the proposed statute was intended "to protect [against] the excessive use or the needless use of public emergency equipment[.]" Tape Recording, Criminal Law Revision Commission, Subcommittee 2, Sept 16, 1969, Tape 81, Side 2. Another member of the subcommittee shared a similar understanding of the new draft:

> "[T]hat says the same thing, the waste of governmental resources, in other words if you're sending the police off on

---

[11] This court considers the commentaries produced by the commission and its subcommittees as part of the Criminal Code's legislative history. *Gaines*, 346 Or at 178.

a wild goose chase by giving them false information and wasting a lot of money and time."

*Id.* (statement of Thomas O'Dell).

Exploring the scope of the proposed law further, Representative Haas described a hypothetical situation in which an officer investigating a crime takes a witness's statement, which turns out to be false. He asked whether that witness could be prosecuted, comparing that situation to "a false police report" and giving, as an example, an individual who "went down and filed a false report that he had been kidnapped." He observed, "[T]hat's what we're talking about—initiating the wheels of law enforcement to go into action on an assertion that [he had] made, as opposed to just a false verbal statement to a police officer." *Id.* (statement of Rep Harl Haas).

A third subcommittee member suggested that the statute could be limited to address the first member's concerns regarding police-initiated questioning by requiring that the person "initiate" (rather than "render[]") a false alarm or report. *Id.* (statement of Rep Wallace Carson). Upon agreeing to that proposal, the subcommittee first voted to amend the most recent draft by using "initiate" in place of "cause" and "render[]," and then adopted the draft as amended, resulting in the wording that is now codified at ORS 162.375(1).

The subcommittee's draft of the "Perjury and Related Offenses" article was considered by the full commission in November of 1969. There was little substantive discussion of the crime now designated as "Initiating a False Report." Minutes, Criminal Law Revision Commission, Nov 7, 1969, 11-12. When the Commission transmitted its proposed draft to the Legislative Assembly, the commentary that accompanied it described the drafters' intent in the following terms:

"Criminal statutes dealing with false fire alarms are found in nearly all American jurisdictions. The rationale supporting criminal liability is based upon the waste of government resources involved and the creation of circumstances where personnel and equipment are made unavailable to deal with legitimate emergencies. Section 212 is intended

to reach fire and police departments, and all other orga-
nizations, public or private, that respond to emergency
alarms involving danger to life or property. The section
applies whether the false alarm was directly or indirectly
caused to be transmitted. Criminal liability should not be
dependent on whether the person acted himself or caused
another to act for him."

Commentary to Criminal Law Revision Commission Proposed
Oregon Criminal Code, Final Draft and Report § 212, 208-
09 (July 1970).

Returning to the parties' arguments, defendant
emphasizes the legislature's narrow purpose in enacting
ORS 162.375(1), highlighting that several of its drafters
expressly indicated the desire to curb the "needless use"
or "waste" of "emergency" or "government" resources. *See,
e.g.*, 370 Or at 595 (comments of Paillette and subcommit-
tee member). Defendant also notes the concern—which the
subcommittee discussed at some length—that the statute
as initially drafted might be broad enough to ensnare wit-
nesses who, perhaps inadvertently, respond with less-than-
perfect accuracy to police-initiated questioning. Defendant
specifically highlights one member's assertion that the
statute should only apply when "a person files a report of
a crime, thereby initiating the wheels of law enforcement
to go into action on an assertion that [the person] made."
Audio Recording, Criminal Law Revision Commission,
Subcommittee 2, Sept 16, 1969, Tape 81, Side 2 (statement
of Rep Harl Haas).

For its part, the state agrees with defendant's
view of the legislature's purpose in enacting that statute;
the state argues, however, that the legislative history that
defendant recounts *also* shows that the drafters did not, in
fact, intend to limit the scope of the statute as defendant
contends they did. Among other things, the state points to
the subcommittee's discussion of a hypothetical involving
"one kid" who calls the police to report a fictitious crime and
the perpetrator's route, and a "second kid" who follows that
with a call, stating, "No, that first one's wrong, it's going
in the other direction." Although one subcommittee member
had suggested that the draft statute would "let the second
guy off," other members responded, "no," because the second

kid would have "initiated the second one." *Id*. (comments by Rep Wallace Carson and Rep Harl Haas). In the state's view, that exchange shows that the drafters of ORS 162.375(1) intended to criminalize the diverting of law-enforcement resources with false allegations of crime, even if the false allegations themselves would not independently trigger an expenditure of resources.

Based on our own review of the legislative history of ORS 162.375, we agree with defendant that it demonstrates the legislature's general goal of conserving emergency resources for their intended purposes. We also agree that it reflects that the drafters of the new statute sought to limit its scope to what was necessary to achieve its purpose, namely, to curb "the excessive use or the needless use of public emergency" resources, which, they understood, might not require "going any further than *** anybody who causes the initial report to issue." *Id.* (comments of Donald Paillette and subcommittee member); *see also id.* (comment of Thomas O'Dell suggesting that proposed language might already encompass that limitation).

But contrary to defendant's assertion, nothing about the legislature's overall objective in enacting ORS 162.375, nor its desire to limit its coverage so as to reach only conduct that implicated the drafters' resource-related concerns, necessarily suggests an intention to penalize false reporting only if it is unaccompanied by truthful reporting likely to trigger its own response. The legislative history of that statute therefore does not foreclose the possibility that the legislature intended that it reach conduct such as defendant's report in this case.

C.  *Synthesis*

We return to the interpretive issue at the core of this case: whether, when a person transmits both true and false allegations of crime to a law-enforcement agency and the agency responds by expending resources, the state must prove that the person's false allegations triggered a greater or different expenditure of resources than the truthful statements would have triggered on their own. In addressing that issue, we note that it is unnecessary for us to conclusively decide whether, as the state appears to argue, a person can

be convicted under ORS 162.375 anytime the person makes a false statement as part of a report that is otherwise true, though our above discussion suggests otherwise. But as to the specific issue before us, we conclude that the state was not required to prove that defendant's false allegations of assault caused law enforcement to devote greater or different resources to the investigation of defendant's report than it would have devoted had she only made the true allegations. Accordingly, the trial court did not err in denying defendant's motion for judgment of acquittal, and the Court of Appeals erred in concluding otherwise.

In reaching that conclusion, we first note that the statutory text of ORS 162.375(1) lends little or no support to defendant's position. As discussed above, the ordinary meanings of the words "false" and "report" do not convey that the truth or falsity of a person's allegations must be considered as a whole, as opposed to looking at whether the person's false allegations themselves constitute a false report. Nor do those terms, at least not in isolation, support the notion that only a "report" shown to have resulted in wasted governmental resources can constitute a "false report." In the absence of other indications that the legislature intended to establish such a requirement, we would be reluctant to recognize that requirement here.

One reason for that reluctance is that, under ORS 174.010, a court is not, when construing a statute, "to insert what has been omitted." And as the state observes, the text of ORS 162.375(1) makes no reference to wasted resources, a consideration that defendant (and the Court of Appeals) would add to the statute. Another reason is that, although defendant says that she is not adding an element to the offense of initiating a false report, her arguments suggest otherwise, which arguably places her at odds with our observation in *Branch* that it does not appear that "an actual response by the organization is an element of [that] crime." 361 Or at 359 n 4. That is, defendant's argument seems to be that—as the Court of Appeals effectively held, *see H. D. E.*, 313 Or App at 362—to prove the "false report" element of ORS 162.375, the prosecution must produce *evidence* that a person's report resulted (or, where no investigation occurred, was at least likely to have resulted) in a

wasteful expenditure of government resources. Because the premise of that argument is that the state failed to prove a required fact, defendant effectively contends that the state has not established an essential element of initiating a false report. *See Black's Law Dictionary* (11th ed 2019) (defining "elements of crime" as "[t]he constituent parts of a crime * * * that the prosecution must prove to sustain a conviction").

Ultimately, we find our discussion of ORS 162.375(1) in *Branch* to provide the best guidance as to its application here. And contrary to defendant's view, her false allegations that the doctor had assaulted her children were not the sort of statements that *Branch* indicates would *not* constitute false reports. Defendant falsely accused the doctor of the crime of assault, and she has never contended that the police would have been unlikely to respond to such an allegation with an expenditure of resources. Thus, her allegation of assault to the Hermiston police was indisputably "a communication that inform[ed] a law enforcement agency or other emergency organization that a situation exists of a type to which the organization would respond with an expenditure of resources." *Branch*, 362 Or at 361. Moreover, at the time that she made it, that allegation identified "new circumstances to which the law enforcement agency [was] reasonably likely to respond as a separate, ongoing crime or emergency." *Id*. at 362. That is, although defendant simultaneously reported that the doctor had harassed her children and assaulted them, there was no existing criminal investigation when she first told the police about the purported assaults. Finally, because defendant falsely accused the doctor of the crime of assault as distinct from the crime of harassment, she did not merely provide additional details about a separate matter under investigation—she did not merely "falsely convey[] information about circumstances to which the agency would be unlikely to devote resources, except for whatever relevance the information may have to an existing criminal investigation." *Id*. Rather, defendant falsely conveyed information regarding a crime that the police were likely to investigate in its own right.

Lastly, even though the legislative history of ORS 162.375(1) supports defendant's contention that the drafters of the statute were exclusively concerned with the waste

and diversion of resources—and that they intended only to criminalize reports that would tend to result in such waste and diversion—nothing about that legislative history suggests the intention to limit the statute's coverage to circumstances in which the state can establish an actual expenditure of resources (or, where no investigation has resulted, a nonetheless likely expenditure of resources) specifically in response to the false report. Consequently, we see no basis to engraft such a requirement here.

Given that understanding of ORS 162.375(1) and the meaning of "false report," we conclude that the trial court did not err by disregarding the apparently truthful information that defendant had reported to the police, denying her motion for judgment of acquittal, and ultimately convicting defendant of initiating a false report based solely on her false assertion that the doctor had assaulted her children. The Court of Appeals therefore erred in concluding otherwise.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.